UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KIMBERLY C. WOOD,

                Plaintiff,                        Case No. 14-cv-13049

v.                                            Honorable Thomas L. Ludington

THE DOW CHEMICAL COMPANY,
ANDREW LIVERIS, and CHARLES J. KALIL,

                Defendants.

_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

Plaintiff Kimberly C. Wood filed her complaint against Defendants Dow Chemical, Andrew N. Liveris, Dow's Chief Executive Officer, and Charles J. Kalil, Dow's General Counsel, on August 6, 2014. Wood alleges a single claim for relief: she contends that her employment was terminated in retaliation for activity protected by the Sarbanes-Oxley Act of 2002. ECF No. 1, at 11. On October 6, 2014, Defendants filed a motion to dismiss, ECF No. 14, claiming that Wood has failed to state a claim on which relief can be granted against any of the three defendants. Because Wood sufficiently pleads a claim for relief against Defendants, their motion to dismiss will be denied.

## I.

Plaintiff Kimberly C. Wood is a former employee of Defendant Dow Chemical Company. She worked at Dow for twenty-five years prior to her separation from the company in October, 2013. ECF No. 1 at ¶ 8.

**A.**

Wood began her career with Dow "as a technologist in the Michigan Division Design Latex and Research." *Id*. at ¶ 13. From there she joined "International Accounting, where her duties included ESPP, payroll, general ledger and consolidations." *Id*. at ¶ 14. Eventually she was transferred to the Corporate Controller's Office. *Id*. at ¶ 15. She claims to be "the first accountant Defendant Dow employed whose job duties were fully dedicated to corporate treasury financial instruments." *Id*. According to Wood, throughout her career her "job duties also included working with financial instruments, interest rates, risk management, hedging, long-term debt, commercial papers, futures, and related financial schedules." *Id*. at ¶ 16.

Wood also claims to have significant training and experience in fraud and accounting. She holds a master's degree in accounting from Central Michigan University and is a certified fraud examiner and certified management accountant. *Id*. at ¶ 9-10. Wood also claims to have been a "former Vice-Chairperson of the American Society of Industrial Security Economic Crime Council." *Id*. at ¶ 11. In addition, she "has spoken at two nation-wide fraud conferences held by the Association of Certified Fraud Examiners." *Id*. at ¶ 12.

Wood's most recent position with Dow was as a fraud investigator. *Id*. at ¶ 26. She had worked in that position since 2001. *Id*. Her job duties required her "to conduct internal investigations and report her findings to her supervisors, including Defendant Dow's Corporate Auditor[.]" *Id*. She claims that she worked "with a group of individuals that operated under three different titles: (1) Asset Protection and Recovery; (2) Fraud Investigative Services; and (3) Corporate Investigations Group." *Id*. at ¶ 27.

**B.**

While working as fraud investigator, Wood claims she "assisted in multiple investigation [sic] into conduct that [she] reasonably believed to constitute violations of Securities and Exchange Commission rules and regulations, Federal statutes relating to fraud against shareholders, and Defendant Dow's Code of Conduct and other policies." *Id*. at ¶ 29. Wood identifies seven specific instances of conduct which she investigated and on which she reported: (1) a construction project for the H Hotel which exceeded budget by $13,000,000.00 and resulted in the retaliatory termination of a Dow employee; (2) unreported personal expenditures made by Dow for Mr. Liveris, which led to Mr. Liveris reimbursing Dow following her report; (3) further personal expenses of Mr. Liveris that were paid by Dow but which went unreimbursed; (4) payments by Dow, at Mr. Liveris' direction, to The Hellenic Initiative ("THI"), Mr. Liveris' charity and Prinkipos, a charity owned by the Greek Orthodox Church; (5) excessive use of the Dow corporate jet and further involvement of Mr. Liveris' and Dow's funds with the Greek Orthodox Church and Prinkipos; (6) improper accounting practices on the Olefins II project to hide cost overruns; and (7) financial statement fraud with the Olefins II project. *Id*. at ¶ 30.[1]

---

[1] Plaintiff's complaint reads as follows:

(a)    That Plaintiff participated in an investigation, along with her supervisor, Simon Solano, Director of Corporate Investigations Group, into and reported on Defendant Dow's expenses in the renovation project at the H Hotel, including discovering and reporting that the project had exceeded the originally authorized budget by $13,000,000.00, the involvement of Defendant LIVERIS's wife and her friend, and the retaliation against a Dow employee, Michael Hayes, who had taken efforts to limit Defendant LIVERIS's wife involvement in the renovation, which specifically included evidence that Defendant LIVERIS had instructed Defendant KALIL that it was "time for retirement" for Mr. Hayes.

(b)    That Plaintiff reported to Doug Anderson, Corporate Auditor, and Mr. Solano the findings of an investigation Plaintiff conducted into the personal expenses of Defendant LIVERIS, entitled "Customer Events Compliance Investigation," that revealed $719,000.00 worth of unreported personal expenses by Defendant LIVERIS[1] and, as a result, lead to further investigations into Defendant LIVERIS's expenses and the requirement that Defendant LIVERIS reimburse those monies to Defendant Dow; following this report, Plaintiff was instructed "that nothing from the CEO's past was to be looked at again and the investigation was over."

Wood claims that her reporting activity alerted her superiors to the possibility that Defendant Dow was violating various federal securities laws and regulations. *Id*. at ¶ 32. Wood further claims that her activity is protected under the Act but that despite this, her reporting upset Dow employees including Defendants Liveris and Kalil who began a pattern of retaliatory conduct which ended with the termination of her employment.

---

[Wood footnotes the preceding allegation with the following: "Examples of the unreported personal entertainment expenses included: (1) a paid vacation for Defendant LIVERIS and his family to attend a safari in Africa; (2) $218,938.00 in expenses for a trip for Defendant LIVERIS and his family to the 2010 Super Bowl; (3) a paid trip to the 2010 World Cup in South Africa for Defendant LIVERIS and his family; and (4) a paid trip to the 2010 Masters' Tournament for Defendant LIVERIS and his family."]

(c)     That Plaintiff conducted another investigation into Defendant LIVERIS's personal expenses and reported that Defendant Dow had paid for Defendant LIVERIS's son's school's intramural basketball jerseys; however, Defendant LIVERIS did not reimburse Defendant Dow for the monies expended.

(d)     That Plaintiff reported to Jeff Tate, Corporate Auditor, and Mr. Solano, through a series of memoranda dated September 20, 2012, January 23, 2013, and August 2, 2013, that her investigation revealed that it appeared that Defendant LIVERIS, through Defendant Dow, had been funneling money by making payments and covering expenses for The Hellenic Initiative ("THI"), Defendant LIVERIS's charity, by falsely identifying those payments as routine business expenses, and that the THI investigation had revealed a lack of integrity in financial records, a conflict of interest between Defendant Dow and Defendant LIVERIS's involvement with and the donations to THI, concerns about due diligence in relation to Defendant Dow's contracts with a particular vendor, and Defendant Dow's expenditures on THI and Prinkipos, a charity owned by the Greek Orthodox Church, exceeded $120,000 and, therefore, Defendant Dow failed to comply with 17 C.F.R. part 229, Item 404 Regulation S-K, and the mandated disclosure.

(e)     That Plaintiff further investigated the excessive use of Defendant Dow's corporate jet and the involvement of Defendant LIVERIS and Dow Assets with regards to the Greek Orthodox Church and Prinkopos.

(f)     That Plaintiff investigated and reported to Jeff Tate, Corporate Auditor, and Mr. Solano the findings of the Olefins II Project investigation, that revealed project managers were purposefully moving expenses to capital to hide cost overruns with the approval of senior business management, a cost accountant admitted to moving $3,800,000.00 from expenses to capital, employees had intentionally changed purchase orders, and that the cumulative dollar value of the movements could reach $34,000,000.00.

(g)     That on October 9, 2013, Plaintiff reported to her direct supervisor, Mr. Solano, that the investigation into the Olefins II Project revealed that there was financial statement fraud.

ECF No. 1 at ¶ 30.

## C.

According to Wood, following a number of her reports and investigations "Defendants and their employees and/or agents made threatening and intimidating comments towards [her.]" *Id*. at ¶ 33. Wood claims that these comments included being directed by supervisors away from current investigations, at times permanently; learning that Defendant Kalil "wanted her fired"; and being informed of her impending termination. *Id*.[2]

The culmination of this retaliatory behavior, according to Wood, was that she was informed on October 10, 2013—the day after she reported an instance of financial statement fraud—"that her employment with Defendant Dow would be terminated on October 31, 2013." *Id*. at ¶ 34. Wood claims that she protested her separation from Dow but that she was nevertheless provided with a severance package. *Id*. at ¶ 35.[3]

---

[2] Plaintiff's complaint reads, in pertinent part:

(a)  That following Plaintiff's reports on the Customers Events Compliance Investigation, Plaintiff was instructed by a supervisor Greg Groholski "that nothing from the CEO's past was to be looked at again and that the investigation was over."

(b)  That following Plaintiff's third THI Report, dated August 2, 2013, Defendant Kalil, told Plaintiff's supervisor that he "wanted her fired."

(c)  That another of Plaintiff's supervisors, Jeff Tate, instructed Plaintiff to "back off the investigation" pertaining to Defendant LIVERIS and that "nothing was going to be done" with Plaintiff's THI reports.

(d)  That the day after Plaintiff reported to her immediate supervisor, Mr. Solano, that the Olefins II investigation revealed financial statement fraud, Plaintiff was informed that her employment would end on October 31, 2013.

ECF No. 1 at ¶ 33.

[3] It should be noted that nothing in Wood's complaint, its attached exhibit, Defendants' motion to dismiss, or any subsequent briefing on the motion explain the exact circumstances of Wood's separation from Dow. Wood alleges in her complaint both actual and constructive discharge but nothing reflects whether her employment was terminated as allegedly planned on October 31, 2013 or if, after hearing of her impending termination, she resigned.

**D.**

Defendant Dow Chemical Company is a Delaware Corporation with its principal place of business located in Midland County, Michigan. *Id*. at ¶ 2. Dow "was and is a company with a class of securities registered under section 12 of the Securities and Exchange Act of 1934[.]" *Id*. at ¶ 45. Defendants Liveris and Kalil are both "officers, employees, and/or agent[s] of Defendant Dow." *Id*. at ¶ 46-47.

**II.**

A complaint is to be dismissed if it "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). A pleading fails to state a claim if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court must construe the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not have provided "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

This standard is forgiving: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*. (internal quotation marks and citations omitted). While both *Iqbal* and *Twombly* demand a certain level of specificity in pleading, neither case fundamentally altered the basic

- 6 -

requirements for pleading a claim for relief. Although not explicitly provided for in the Federal Rules of Civil Procedure, parties may plead on the basis of information and belief "where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible[.]" *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal citations omitted).

Importantly, "the 12(b)(6) motion does not attack the merits of the case.  It merely challenges the pleader's failure to state a claim properly." *Moore v. Johnson*, 826 F. Supp. 1106, 1108 (W.D. Mich. 1993) (citing 5c Fed. Prac. & Proc. Civ. § 1364 (3d ed.)). "Such motions assume the truth of a pleading's factual allegations and test only its legal sufficiency." *McCall v. Pataki*, 232 F.3d 321, 322 (2d Cir. 2000). A motion to dismiss "presents a pure legal question, based on allegations contained within the four corners of the complaint[.]" *Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010). So while the complaining party is permitted an opportunity to respond to a motion to dismiss, the sufficiency of the complaint is a matter of law for the district court to resolve. *McCall*, 232 F.3d at 322.

### III.

Plaintiff Wood brings her sole claim under the whistleblower provision of Sarbanes-Oxley. She claims that she was fired in retaliation for reporting suspected violations of federal securities laws. Under Sarbanes-Oxley, publicly traded companies are prohibited from discriminating or retaliating against employees who act as whistleblowers. The Act defines whistleblowing as:

> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—

- 7 -

> (A) a Federal regulatory or law enforcement agency;
>
> (B) any Member of Congress or any committee of Congress; or
>
> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or
>
> (2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

18 U.S.C.A. § 1514A.

Defendants have filed a motion to dismiss, claiming that Wood has failed to state a claim upon which relief may be granted under § 1514A of the Act.

> To prevail on a claim of retaliation pursuant to § 1514A, the plaintiff must show that: ["](1) he or she engaged in a protected activity; (2) the employer knew that he or she engaged in the protected activity; (3) he or she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.["]

*Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 219 (2d Cir. 2014) (quoting *Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 451 (2d Cir. 2013)). Defendants allege in their motion to dismiss that Wood's complaint fails to meet each one of these pleading requirements, either with respect to Dow Chemical or the individually named defendants. ECF No. 14 at ii.

## A.

The first requirement to plead a claim under the Act is that a plaintiff must allege that "he or she engaged in a protected activity." *Nielsen*, 762 F.3d at 219. Defendants claim that "the allegations of the complaint are insufficient to plausibly allege that plaintiff had an 'objectively reasonable' belief that she had reported a violation of any relevant statute[.]" ECF No. 14 at ii.

The Act itself explicitly protects "any lawful act done by [an] employee":

. . . to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders[.]

18 U.S.C.A. § 1514A. Defendants read the statute as requiring that Wood's reports be "related to conduct that [she] reasonably believed to be a violation of a relevant securities law or regulation specified in the statute." ECF No. 14 at 17. But this reading ignores the statute's phrasing that "any provision of Federal law relating to fraud against shareholders" can form the basis of protected activity. 18 U.S.C.A. § 1514A. Thus, as long as an individual alleging retaliatory discharge under the Act can show a reasonable belief that "any provision of Federal law relating to fraud against shareholders" was violated, he or she has stated a claim. *Id.*; *see also Villanueva v. U.S. Dep't of Labor*, 743 F.3d 103, 108-09 (5th Cir. 2014) ("Section 806 prohibits retaliation *only if* the employee provides information regarding conduct that he or she reasonably believes violates one of six enumerated categories of U.S. law.").

For a plaintiff to prove, at the pleading stage, that he or she engaged in protected activity the pleading must meet both a subjective and objective test. *Nielsen*, 762 F.3d at 221. "That is to say, a plaintiff 'must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation.'" *Id.* (quoting *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir.2008)). A "plaintiff's particular educational background and sophistication [is] relevant to the subjective component." *Day v. Staples, Inc.*, 555 F.3d 42, 54 n.10 (1st Cir. 2009). Further, "[t]he employee is not required to show that there was an actual violation of the provision involved." *Id.* at 55. Also, an employee need not "cite a code section he believes was violated." *Fraser v. Fiduciary Trust Co. Int'l*, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006). "General inquiries" by an employee, however, do not constitute protected activity. *Id.*

- 9 -

Defendants allege that Wood is unable "to plausibly allege a reasonable belief that the conduct she reported was an actual or potential" fraud upon shareholders. ECF No. 14 at 18. The Second Circuit, in *Nielsen*, confronted a claim that the plaintiff, Nielsen, could not meet the reasonable objective belief standard under the Act. In *Nielsen*, the complaint alleged that the plaintiff "reasonably believed that defendants were committing fraud upon [their] shareholders and would likely continue violating the United States mail and wire fraud statutes by using telephone lines and emails in furtherance of the fraud." *Nielsen*, 762 F.3d at 222. Such an allegation was not sufficient to state a claim under the Act that the plaintiff was engaged in protected activity.

The Second Circuit noted that "Nielsen has not plausibly pled an objectively reasonable belief that AECOM [(the defendant)] engaged in mail or wire fraud, as both require a scheme to steal money or property—allegations that do not appear in the complaint." *Id*. Further, Nielsen did not show "that it was objectively reasonable to believe that the conduct he complained of constituted shareholder fraud. In essence, Nielsen alleges that a single employee failed properly to review fire safety designs." *Id*. Nielsen did not plead that a federal statute or regulation required the type of fire safety review that was not performed, that the defendant had submitted the fire safety designs to an outside body for review, "or even that the allegedly inadequate fire safety review posed any specified safety hazard." *Id*. Thus, Nielsen could have overcome his conclusory allegation that the defendants were committing fraud upon shareholders by alleging some facts that support a reasonable belief of a specific instance of fraud. Nielsen's failure to do so was fatal to his complaint. The *Nielsen* court then proceeded to highlight examples of well-pleaded allegations of protected activity and those cases are instructive here.

- 10 -

The Third Circuit's decision in *Wiest v. Lynch* provides instruction for understanding the type of facts that must be pled to satisfy the objective belief standard. 710 F.3d 121 (3rd Cir. 2013). In *Wiest*, the plaintiff alleged five different reports that constituted protected activity under the Act. Wiest alleged in his complaint that he "worked for approximately thirty-one years in Tyco's accounting department until his termination in April 2010." *Wiest*, 710 F.3d at 124. He also claimed that his office was being closely scrutinized as a result of a corporate scandal at his employer's parent company. *Id*. Leading up to his termination, and from "around 2007, Wiest established a pattern of rejecting and questioning expenses that failed to satisfy accounting standards or securities and tax laws." *Wiest*, 710 F.3d at 124 (internal quotation marks omitted).

Wiest alleged that the defendants improperly handled the documentation and accounting of three separate events: the Atlantis Resort Event, the Venetian Resort Event, and the Wintegreen Resort Event. *Id*. at 135-36. He also alleged that he alerted his employer to the improper expenses submitted by an employee and the associated tax consequences, and "that he 'raised questions' about proper accounting treatment of other events that occurred between late 2007 and September 2009[.]" *Id*. at 137. The Third Circuit analyzed each of these allegations separately.

With respect to the Atlantis Resort event, the Third Circuit held that the complaint properly pleaded allegations of protected activity because Wiest reasonably believed that activities he reported constituted violations of the provisions enumerated in § 806 of the Act. *Id*. at 135-37. Wiest had "refused to process a payment and sent an email to his supervisor regarding an event that Tyco intended to hold at the Atlantis Resort in the Bahamas" because he "belie[ved] that the costs were inappropriately charged entirely as advertising expenses" *Id*. at 124. The defendant's management eventually determined that reimbursing the event as initially

charged would have resulted in a fraudulent tax filing and that the event would have to be reported as income to its employees. *Id*. The Third Circuit wrote that "[a] reasonable person in Wiest's position who had seen the expense request for the extravagant Atlantis event could have believed that treating the Atlantis event as a business expense violated a provision of Section 806[.]" *Id*. at 135.

As to the Venetian Resort event, Wiest's activity involved directing a subordinate to send an email to the employee who submitted the request to inform that employee that the request for payment would not be processed without more information. *Id*. at 124. Eventually, the information was provided and Tyco's tax department decided that the expense request was a related to a proper business purpose. *Id*. On these facts the Third Circuit concluded that

> Even if the facts in the Complaint established that Wiest subjectively believed the expense request for the Venetian event could have violated a provision in Section 806, . . . objectively, a reasonable person in Wiest's position would not have believed that the expense request that initially lacked a detailed agenda and breakdown of expenses would constitute a violation of one of the provisions listed in Section 806.

*Wiest*, 710 F.3d at 136. The lack of information attached to the expense request was insufficient to substantiate an objectively reasonable belief of fraud until that information was known. *Id*.

The third event, at Wintergreen Resort, suffered from the same expense infirmities as the first event and also failed to comply with Tyco's internal control procedures because it was not authorized by Tyco's CEO. *Id*. at 125. According to the *Wiest* court

> [t]he averments of the Complaint support an inference that Wiest subjectively believed that the lack of the CEO's approval, which contravened internal control procedures, would violate one of the provisions enumerated in Section 806. Furthermore, it is plausible that a reasonable person in Wiest's position could have believed that the event's approval by an attendee of the event, who would therefore directly benefit from that approval, instead of by the CEO as required by internal control procedures, may have violated one of the provisions contained in Section 806.

*Wiest*, 710 F.3d at 136.

The Third Circuit then addressed Wiest's final two allegedly protected acts and found that they did not meet the Act's pleading standard because they merely alleged that Wiest "raised questions" about the propriety of event expenditures. *Id*. at 137. Wiest failed to "specify anything about the nature or content of his communications." *Id*. "By itself, the allegation that Wiest 'raised questions' does not create a plausible inference that he or any reasonable person in his position would believe that expenditures on the events rose to the level of a violation of a provision in Section 806." *Id*.

The Third Circuit then addressed whether Wiest had a subjectively reasonable belief that fraud on shareholders was occurring. The court focused on two factors when deciding whether Wiest stated a claim under the Act. First, the court considered his experience with the company and the subject matter he was reporting upon. Second, the court examined the sufficiency of the information he claimed he was provided at the time of each of his reports or inquiries. The *Wiest* court did not demand strict adherence to the legal factors of the fraud Wiest believed to have occurred. It also did not demand that he allege an existing or ongoing violation of an enumerated provision. *Id*. at 137. Other circuits have similarly rejected a requirement of rigid formulism and specifically worded invocations of illegality. *See Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1132-33 (10th Cir. 2013) (holding that the complainant sufficiently stated a claim under the Act because his "allegations clearly amounted to a claim that [the Vice President of Communications] had converted company money to her own use" despite never using the words "fraud" or "illegal" in his reports).

With Wood, as with Wiest, sufficient facts are presented in her complaint regarding her subjective beliefs and her objective circumstances for it to survive. First, much like the facts supporting Wiest's subjective belief of fraud, Wood had a great deal of experience in accounting

- 13 -

and fraud detection. Wood, at the time she was separated from Dow, had been working for the company for approximately twenty-five (25) years. ECF No. 1 at ¶ 8. She had an advanced degree in accounting and was a certified fraud examiner and certified management accountant. *Id*. at ¶ 9-10. During her time at Dow, Wood worked in the Corporate Controller's Office and alleges that she "was the first accountant Defendant Dow employed whose job duties were fully dedicated to corporate treasury financial instruments." *Id*. at ¶ 15. Further, "over her career, [Wood's] job duties also included working with financial instruments, interest rates, risk management, hedging, long-term debt, commercial papers, futures, and related financial schedules." *Id*. at ¶ 16. Wood's employment history is consistent with an employee who would have had extensive experience with financial services fraud and the types of fraudulent activities that could implicate a violation of federal law.

In addition to Wood's job experience, her employment responsibilities are similarly reflective of someone who would be familiar with fraudulent activity and the federal law governing that activity. Wood alleges that she was "required to submit periodic reports to the Securities and Exchange Commission" and "to establish an Audit Committee with various responsibilities, including but not limited to establishing procedures for the reporting of audits, financial reporting, and the hiring of public accounting firms[.]" ECF No. 1 at ¶ 20-21. The Audit Committee with which Wood was involved was "also obligated to establish procedures for receiving and treating complaints regarding accounting, internal accounting control and auditing matters." ECF No. 1 Wood was also tasked with "conduct[ing] internal investigations and report[ing] her findings to her supervisors, including Defendant Dow's Corporate Auditor, who in turn had statutory and regulatory obligations to report such information to the federal government." ECF No. 1 at ¶ 26. Wood alleges that on multiple occasions during the course of

her employment she was a part of investigating conduct she reasonably believed constituted violations of federal law. ECF No. 1 at ¶ 29.

While Wood's employment responsibilities and experience tend to corroborate her allegation that she had a subjective belief that the conduct which she was investigating violated federal law, her complaint will be dismissed if she fails to specifically identify that conduct and establish that it was objectively reasonable for her to believe that conduct violated federal law. In her complaint, Wood outlines a number of incidents the investigation of which constituted protected activity: (1) a construction project which exceeded budget by $13,000,000.00 and resulted in the retaliatory termination of a Dow employee; (2) unreported personal expenditures made on Mr. Liveris' behalf by Dow which led to Mr. Liveris reimbursing Dow following the investigation; (3) further personal expenses of Mr. Liveris that were paid by Dow but which went unreimbursed; (4) payments by Mr. Liveris, through Dow, to The Hellenic Initiative ("THI"), Mr. Liveris' charity and Prinkipos, a charity owned by the Greek Orthodox Church; (5) excessive use of the Dow corporate jet and further involvement of Mr. Liveris' and Dow's funds with the Greek Orthodox Church and Prinkipos; (6) improper accounting practices on the Olefins II project to mask cost overruns; and (7) financial statement fraud with the Olefins II project. ECF No. 1 at ¶ 30.

Once again, *Wiest* is instructive. Wood's conduct, as alleged in the complaint, goes beyond merely "raising questions" and sufficiently alleges activity that an objectively reasonable person would believe to be a violation of federal law. It is true that some allegedly protected activity can be so innocuous or trivial and as a result, its relationship to shareholder interests is so attenuated, that even if it is reasonably believed to be a violation of federal law it is not protected activity under the Act. *See Nielsen*, 762 F.3d at 222 (citing *Sylvester v. Parexel Int'l LLC*, ARB

- 15 -

No. 07–123, 2011 WL 2165854, at *19 (ARB May 25, 2011). These allegations, however, include more than mere trivia or general inquiries.

 Some of the allegations by Wood directly implicate activity that a reasonable person, knowing the result of her reporting, would believe constituted protected activity. For example, her report regarding Mr. Liveris' personal expenses that resulted in Mr. Liveris reimbursing Dow and publicly disclosing the reimbursement would lead a reasonably objective individual to believe the reported activity might implicate fraud against shareholders. The same can be said of her reporting on the Olefins II project. There, Wood found that $3,800,000.00 had been improperly accounted for in order to "hide cost overruns" and was done "with the approval of senior business management." ECF No. 1 at ¶ 30. As a result of these discoveries she informed her supervisor that she believed there to be financial services fraud occurring. *Id.* A reasonably objective individual would not describe such discrepancies as trivial and could believe those practices to be inconsistent with shareholder interests.

 According to Defendants, *Nielsen* is persuasive authority in analyzing Wood's complaint. In *Nielsen*, the plaintiff's complaint was dismissed for stating that he "reasonably believed that defendants were committing fraud upon [their] shareholders and would likely continue violating the United States mail and wire fraud statutes by using telephone lines and emails in furtherance of the fraud." *Nielsen*, 762 F.3d at 222. Defendants are correct that this sort of allegation is precisely the type of bare, conclusory claim that the *Twombly* and *Iqbal* decisions caution against. But that is not true with respect to Wood's case. Wood alleges specific instances of conduct she believed could reasonably constitute a violation of the provisions in the Act. These assertions are supported by a factual explanation that a reasonable person of Wood's training and experience could likewise conclude that malfeasance was implicated.

- 16 -

Defendants do not specify exactly how Wood's allegations fail as a general matter to state a claim under the Act. Defendants state only that Wood fails "to tie the alleged conduct she reported to any of the enumerated statutes, relying instead on the generic, conclusory allegation that she reported 'suspected fraudulent and unlawful actions.'" ECF No. 14 at 19. But, as outlined above, Wood need not specifically allege violations of the enumerated provisions under the Act.

Defendants' more specific attacks on the activity which Wood allegedly believed to be fraudulent are similarly without merit. With respect to Wood's claims of improper personal expenditures and improper charitable contributions, Defendants claim her allegations fail to state a claim under the Act because they fail to state a claim under any of the enumerated provisions of federal law found in the Act. ECF No. 14 at 20-22. But the pleading standard under the Act is not so demanding. Wood need only allege that she reasonably believed the activity to have violated an enumerated provision, not that a violation actually occurred. *Day v. Staples, Inc.*, 555 F.3d 42, 55 (1st Cir. 2009). Defendants claim that if the elements of the enumerated statute are not met it is unreasonable for an individual to believe that a violation of the statute has occurred. But this argument attempts an end-around of the relaxed pleading standards for showing protected activity under the Act.

With respect to the Olefins II allegation by Wood, Defendants assert that the activities are not significant enough to be cognizable under the Act. They claim that "not every alleged incident of fraudulent behavior within a corporation can form the basis for . . . a claim [under the Act]." ECF No. 14 at 25. Defendants cite a case from the District of New Jersey supporting the position that the Act should not be applied to all incidents of fraudulent activity that result in accounting misstatements. *See Safarian v. Am. DG Energy Inc.*, No. CIV. 10-6082, 2014 WL

1744989 (D.N.J. Apr. 29, 2014). But the facts of *Safarian* are inapposite. In *Safarian*, the plaintiff was an engineer who threatened to expose "overbilling, improper construction, and failure to obtain permits." *Id*. at *1. Plaintiff merely alleged, to substantiate a reasonable belief of a violation of one of the Act's enumerated provisions, that "overbilling might eventually lead to incorrect accounting records and tax submissions." *Id*. at *4. Safarian, however, had no contact with the accounting department and no knowledge of the actual accounting for the allegedly improper billing procedures.

Here, by contrast, Wood has alleged multiple instances of actual accounting misstatement, one of which was associated with the Olefins II project. According to her complaint "project managers were purposefully moving expenses to capital to hide cost overruns with the approval of senior business management." ECF No. 1 at ¶ 30. Again, these are allegations made by an experienced fraud investigator with accounting experience, not a product engineer. Defendants' reliance on *Safarian* is misplaced.

In light of the foregoing, Wood's complaint does not fail to allege protected activity upon which she may state a claim for relief under the Act.

**B.**

Defendants also attack the second prong of Wood's prima facie case under the Act. Wood claims that Defendants Liveris and Kalil, in their individual capacities, directed her termination in retaliation for her protected activity. In this respect, Defendants contest only the knowledge Defendants Liveris and Kalil had of Wood's allegedly protected activity. ECF No. 14 at ii. At this stage, Defendants do not claim that Dow, the incorporated entity, was unaware of her allegedly protected acts. With respect to this element, Defendants claim that Wood "fails to

plausibly allege that either individual knew of her allegedly protected activity or participated in any adverse employment action against her." *Id*.

When alleging that a named individual defendant engaged in retaliatory conduct under the Act, a plaintiff must allege that the individual defendant had knowledge of plaintiff's protected activity. *See Wiest v. Lynch*, No. 10-3288, 2014 WL 1490250, at *16 (E.D. Pa. Apr. 16, 2014). To draw such a connection, there must be sufficient facts outlined in the complaint to justify an inference that the individual defendants knew of plaintiff's protected activity and directed her termination. *Id*. Where a complaint lacks sufficient facts to justify such an inference, circumstantial evidence of knowledge on the part of individual defendants will not sustain the complaint against a motion to dismiss. *Id*. at *17.

Wood's allegations against Mr. Liveris meet this standard. Her claims are reducible to the allegation that Mr. Liveris is Dow's CEO and that she conducted investigations of Mr. Liveris' activities, particularly activities involving his family, and that he reasonably knew of her conduct and directed her termination. Wood does not allege Mr. Liveris had actual knowledge of Wood's activities. But the pleading standard under the Federal Rules of Civil Procedure are not so demanding.

For Wood's claims against Mr. Liveris to survive, Wood need only allege sufficient facts in her complaint from which it could be inferred that Mr. Liveris had knowledge of her protected activities and played a role in the adverse employment action taken against her. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") "Asking for plausible grounds to infer [knowledge on the part of Mr. Liveris] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence of [knowledge.]" *Twombly*, 550 U.S. at 556. Wood's investigations were not just focused on the conduct of some mid-level managers that may or may not have been brought to the attention of upper management. They were focused on the Chief Executive Officer himself. Most notably, one of Wood's investigations allegedly led to Mr. Liveris reimbursing Dow for monies the company had expended on matters deemed personal. The reimbursement was publicly reported to Dow's shareholders. The complaint contains sufficient facts to permit the plausible inference that discovery could lead to evidence of wrongdoing on the part of Mr. Liveris. His motion to dismiss will be denied.

Wood's allegations concerning Defendant Kalil's knowledge of her activities and participation in the adverse employment actions she suffered in large part mirror those made against Mr. Liveris. Moreover, Wood alleges that her "reporting relationships" were reorganized and resulted in her reporting to the legal department, headed by Mr. Kalil. ECF No. 1 at ¶ 39. Furthermore, she specifically alleges that "Defendant Kalil . . . told Plaintiff's supervisor that he 'wanted her fired.'" ECF No. 1 at ¶ 33. As with the claims against Mr. Liveris, the facts Wood alleges regarding her reorganized reporting relationships are sufficient to permit an inference of plausibility that Mr. Kalil had knowledge of her activities. Plaintiff's allegations about Mr. Kalil's comment expressing his desire for Wood's termination bolsters this inference. Mr. Kalil's motion to dismiss will also be denied.

## C.

Defendants' second claim in their motion to dismiss is that Wood's "allegations regarding alleged harassment and constructive discharge are insufficient to establish an 'adverse employment action' under [the Act.]" ECF No. 14 at ii. Wood, in response, claims that she does not allege merely constructive discharge. Rather, she claims that she has:

> . . . identified four materially adverse actions: (1) threatening and harassing
> statements regarding Plaintiff's investigations; (2) reassignment from an ongoing
> investigation, THI; (3) reorganizing Plaintiff's reporting relationship, requiring
> her to report her investigations to Kara Gordon of the Legal Department, who
> directly reported to Defendant Kalil; and (4) actual and/or constructive discharge.

ECF No. 19 at 25.[4] In reply, Defendants retain their focus on Wood's alleged constructive

discharge. ECF No. 23 at 6. Thus, Defendants' motion will be construed literally: as relating

only to Wood's claim that her constructive discharge is sufficient to state a claim for retaliation

under the Act and not addressing Wood's other claims of adverse employment action, including

actual discharge.

The test for constructive discharge in the Sarbanes-Oxley context was addressed by the

Tenth Circuit in *Lockheed Martin*: "Constructive discharge occurs when an employer unlawfully

creates working conditions so intolerable that a reasonable person in the employee's position

would feel forced to resign. The plaintiff's burden is substantial." *Lockheed Martin*, 717 F.3d at

1133; *see also Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-150 (2004) (applying

same intolerableness standard in Title VII context). The Sixth Circuit employs an identical

constructive discharge standard in other contexts. *See McKelvey v. Sec'y of U.S. Army*, 450 F.

App'x 532, 535 (6th Cir. 2011) (applying same intolerableness standard in Rehabilitation Act

context). In the Sixth Circuit the question of constructive discharge is at least partly one of law

and also involves "some inquiry into the employer's intent and the reasonably foreseeable impact

of its conduct on the employee." *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1249 (6th Cir.

1989) (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987)). A court must

consider the totality of the circumstances when determining whether a constructive discharge

occurred. *Lockheed Martin*, 717 F.3d at 1133.

---

[4] Importantly, the circumstances surrounding Wood's separation from Dow are not entirely clear.

"The test deliberately 'sets a high bar,' as the law generally expects employees to remain on the job while pursuing relief from harassment." *McKelvey v. Sec'y of U.S. Army*, 450 F. App'x 532, 535 (6th Cir. 2011) (quoting *Porter v. Erie Foods, Int'l*, 576 F.3d 629, 639–40 (7th Cir. 2009). The Sixth Circuit has outlined seven factors to consider when determining whether a reasonable person would have felt compelled to resign under the circumstances:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001).

Defendants claim that Wood fails to plead sufficient facts to meet this standard. In Wood's reply to Defendants motion she focuses on a number of adverse employment actions which she includes in her complaint. Important for current purposes is whether any of those actions, independently or together, meet the standard of constructive discharge.[5] Wood claims that the aggregate effect of the "unfavorable personnel actions" she suffered, including being told that she was to be terminated, amounted to constructive discharge. ECF No. 14 at 13. She alleges that she was subject to "numerous threatening and/or harassing statements", reassignment "away from ongoing investigations", and reorganization of her "reporting relationships by requiring [her] to report her investigatory activities to the legal department". *Id.* These allegations are, however, wholly conclusory and without sufficient factual substance to support her claims. The

---

[5] It should be noted here that Wood also alleges actual discharge, but the complaint and Defendants' motion to dismiss are curiously bereft of information sufficient to determine the exact nature of her separation from Dow. Both parties refer to her departure alternatively as separation, termination, and retirement. It is not disputed that Wood was informed on October 10, 2013 that her employment would be terminated by October 31, 2013. What the parties' papers do not indicate is what the nature of her separation was between those two dates. There is some evidence that Wood was offered a severance package but it is not clear whether she eventually accepted it or not. Furthermore, it is not clear whether her separation was styled as retirement, discharge, or voluntary separation.

only allegation supported by specific factual information is her claim that she was subject to threatening and harassing statements.

Wood offers four specific instances of threats and harassment to which she was subjected:

> (a) That following Plaintiff's reports on the Customers Events Compliance Investigation, Plaintiff was instructed by a supervisor Greg Groholski "that nothing from the CEO's past was to be looked at again and that the investigation was over."
>
> (b) That following Plaintiff's third THI Report, dated August 2, 2013, Defendant Kalil, told Plaintiff's supervisor that he "wanted her fired."
>
> (c) That another of Plaintiff's supervisors, Jeff Tate, instructed Plaintiff to "back off the investigation" pertaining to Defendant LIVERIS and that "nothing was going to be done" with Plaintiff's THI reports.
>
> (d) That the day after Plaintiff reported to her immediate supervisor, Mr. Solano, that the Olefins II investigation revealed financial statement fraud, Plaintiff was informed that her employment would end on October 31, 2013.

ECF No. 1 at 9. Reasonable jurors could not differ as to whether Wood was constructively discharged on the basis of the first three allegations. Incidents (a) and (c) do not appear to be any more than instruction from supervisors as to the scope and conduct of her job responsibilities. Without any further indications of threatening or harassing behavior, two comments from supervisors, without any temporal context, does not meet the high bar for constructive discharge. Similarly, incident (b) does not allege enough factual information to determine that it rises to the level of discharge. While Wood does claim that her job reporting was redirected through the legal department, she does not allege that Defendant Kalil possessed the authority to terminate her employment. Absent such an allegation, incident (b) is no more than a hortatory directive by an individual with no power over Wood's employment.

- 23 -

This leaves incident (d). Wood claims that being informed she is to be terminated creates the type of intolerable working condition that the constructive discharge doctrine is designed to guard against. At least one court disagrees. *See Hill v. St. Louis Univ.*, 923 F. Supp. 1199, 1209 (E.D. Mo. 1996) ("It is clear that it was not her working conditions that "forced" plaintiff to resign, but rather being informed that she was being terminated from her employment. Consequently, merely being informed of termination cannot constitute a 'constructive discharge'.") The court in *Hill* noted that the plaintiff "offer[ed] no legal support for her contention that notice of termination and choosing to resign instead is a 'constructive discharge'." *Id.* This Court is likewise aware of no such authority. *Hill*, however, is unpersuasive in light of the Sixth Circuit's test for constructive discharge and the factors to be considered under that test. Being informed of impending termination two days after making a significant report of fraud could create conditions intolerable to a reasonable employee.

Wood reported on October 8, 2013 that Dow had engaged in accounting practices related to the Olefins project that made "it appear that the project had not gone over budget." ECF No. 1, Ex. A at 18. Two days after this report Wood was told that her employment will end on October 31, 2013. *Id.* In the period after she was informed of her impending termination she was told on numerous occasions by her supervisor that she "asked for a [severance] package" despite making clear that she made no such request. *Id.* "Over her protest, [Wood] was provided a severance package." *Id.* The claims that her supervisors continually informed her that she would be provided a severance package, despite her informing them she did not desire severance or a package, could suggest Dow intended to terminate Wood and sought to incent a voluntary termination. Taken together, the alleged conduct is sufficient to state a claim of constructive discharge.

- 24 -

**D.**

Defendants next claim that Wood's "complaint fails to allege a plausible causal connection between [her] allegedly protected activity and her separation from the Dow Chemical Company[.]" ECF No. 14 at ii. To state a claim for relief under the Act, a plaintiff must allege that "the protected activity was a contributing factor in the unfavorable [employment] action" suffered by the plaintiff. *Nielsen*, 762 F.3d at 219. A "contributing factor" "mean[s] any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (quoting 135 Cong. Rec. 5033 (1989) (Explanatory Statement on S. 20)). "This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action[.]" *Id.* "This element is broad and forgiving[.]" *Lockheed Martin,* 717 F.3d at 1136.

To show a "causal connection" a plaintiff, at the pleading stage must allege sufficient facts "to raise the inference that the protected activity was a contributing factor in the unfavorable action." *Wiest v. Lynch*, 710 F.3d 121, 129 (3d Cir. 2013) (citing 29 C.F.R. § 1980.104(e)(2)(i)–(iv)). The facts necessary to substantiate an inference of contribution "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of a causal connection. *Twombly*, 550 U.S. at 556. "Temporal proximity between the protected activity and adverse employment action may alone be sufficient to satisfy the contributing factor test." *Lockheed Martin*, 717 F.3d at 1136 (citing *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir.2009); *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir.1996)) (holding mere temporal proximity

sufficient on direct review of Administrative Review Board decision in case brought under Sarbanes-Oxley's whistleblower provision); compare *Latosky v. Morrison-Knudsen Corp.*, 103 F.3d 129 (6th Cir. 1996) (holding "the mere fact that adverse employment actions occurred after plaintiff engaged in protected activity is insufficient to support an inference of retaliation" at the summary judgment stage of ADEA action), *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272-73 (6th Cir. 1986) (holding temporal proximity insufficient on review of district court judgment in Title VII action). "But temporal proximity alone is *usually* insufficient to constitute evidence that would prove that an employer retaliated against an employee for engaging in alleged protected activity." *Riddle v. First Tennessee Bank, Nat. Ass'n*, 497 F. App'x 588, 596 (6th Cir. 2012) (hearing case on appeal from summary judgment) (emphasis added).

According to Defendants, Wood's "allegations fail to raise a plausible inference that her reporting activity was the cause of any adverse employment action." ECF No. 14 at 10. But this statement is not the standard by which Wood's complaint is tested on this issue. Wood need only plead sufficient facts, taken as true, that support the inference that her whistleblowing activity "tended to affect [her] termination in at least some way." *Feldman v. Law Enforcement Associates Corp.*, 752 F.3d 339, 348-49 (4th Cir. 2014). Put another way, Wood need only show that her protected activity "played a role in" her dismissal. *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140-41 (Fed. Cir. 1993)

In Wood's complaint she alleges that "following several of [her] reports and investigations, Defendants and their employees and/or agents made threatening and intimidating comments towards [her.]" ECF No. 1 at ¶ 33. Furthermore, she alleges that "following [her] reporting of financial statement fraud of October 9, 2013 . . . on the next day October 10, 2013, [she] was informed that her employment with Defendant Dow would be terminated on October

- 26 -

31, 2013." *Id.* at ¶ 34. Defendants find these allegations unpersuasive. First, Defendants claim that a number of the reports referenced by Wood formed a part of reporting activity that "began four years before her separation from Dow." ECF No. 14 at 11. Specifically, Defendants aver that Wood's report on Mr. Liveris's personal expenses "was issued . . . almost three and a half years before" her adverse employment action and her reporting related to The Hellenic Initiative and the Greek Orthodox Church took place "in September 2012, still more than a year before her alleged termination." *Id.*

According to Defendants, this temporal proximity is too attenuated to substantiate the fourth prong of a retaliation claim under the Act. Defendants state that "courts in this Circuit and elsewhere have routinely held that temporal separations far shorter than the four years at issue here are too attenuated to support an inference of causation." *Id.* While this is correct, Wood does not allege a temporal gap of four years. She alleges that her protected activity began on that date, but continued up until the day she contends her employment was terminated. *See* ECF No. 1, Ex. A at 7-18. Courts have found periods of time similar to many of those in Wood's complaint as sufficient to meet the contributing factor requirement under the Act. *See Wiest*, 710 F.3d 121 (3d Cir. 2013) (approving of a series of protected activities initiated three years before termination). Taking Wood's allegations as true, as this Court must, her complaint meets the requirements of establishing a sufficiently close temporal proximity between her protected activity and her constructive termination to state a claim for relief. While many of Wood's allegedly protected acts occurred in advance of her termination, at least one allegedly occurred the day before she was told her employment was at an end.

But Defendants are not satisfied with this allegation, either. According to Defendants "Plaintiff's complaint contains no allegations to explain how a report submitted to her direct

supervisor was somehow communicated up the chain and resulted in a corporate decision by Dow, its CEO, and its General Counsel to terminate her in under twenty-four hours." ECF No. 14 at 12. Defendants believe that Wood "asks the Court to simultaneously accept two contradictory propositions:" that her termination was both long in the making and the result of swift and immediate action. *Id*. at 12-13. But at the pleading stage Wood need not allege how the report reached individuals with the authority to terminate her employment and that they chose to do so. She need only allege facts sufficient for a plausible inference to be drawn that her reporting contributed to her termination. This, she has done. Courts have found that a one day gap between a protected activity and termination is not too short a time period from which to infer a causal connection between the two. *See, e.g.*, *Kalkunte v. DVI Financial Services, INC. and AP Services, LLC*, No. 2004-SOX-00056, 2005 WL 4889006, at *46 (U.S. Dept. of Labor SAROX July 18, 2005) (one week); *Halloum v. Intel Corporation*, No. 2003-SOX-0007, 2004 WL 5032613, at *16 (U.S. Dept. of Labor SAROX March 4, 2004) (citing instances where inferences of causation were drawn from anywhere between two days and one year). It is not implausible that discovery could lead to information that tends to prove the communication of Wood's report to the Defendants and that a decision to terminate her employment was made within a twenty-four hour period.

## IV.

Accordingly, it is **ORDERED** that Defendants Dow Chemical Company, Andrew N. Liveris, and Charles J. Kalil's Motion to Dismiss, ECF No. 14, is **DENIED**.


Dated: December 15, 2014                s/Thomas L. Ludington
                                        THOMAS L. LUDINGTON
                                        United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 15, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS